## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

1.      Your affiant, Detective Christopher Pyler, hereby informs the Court that he is a commissioned peace officer with the Westminster, Colorado Police Department, and has been assigned as a federal task force officer with the FBI Denver Rocky Mountain Safe Streets Task Force ("RMSSTF") since January 2015.  Your affiant is responsible for investigating violent crimes in the Denver metropolitan area, including bank and business robberies, kidnappings, carjackings, and weapons violations. Your affiant has been a police officer in Colorado for more than thirty years and has training and experience in the investigation of property crimes, financial crimes, and violent crimes. The information contained in this affidavit is based upon information compiled from personal involvement, witness/victim interviews, fellow law enforcement officers, informants and by reading official police reports.

2.      This affidavit is being submitted in support of a criminal complaint and affidavit charging DHAL PIO BOL BUK with violations of Title 18, United States Code, Section 2119(1), Carjacking; Title 18, United States Code, Section 924(c)(1)(A)(ii), Brandishing a Firearm During and In Relation to a Crime of Violence, and Title 18, United States Code, Section 922(o)(1), Unlawful Possession of a Machine Gun. Due to the limited purpose of this affidavit, your affiant has not included each and every fact known concerning this investigation, although, to the best of his information, knowledge and belief, your affiant has not omitted any material fact that undermines the statements and conclusions herein. Your affiant has set forth only the facts your affiant believes are necessary to establish probable cause to show that DHAL PIO BOL BUK committed the above crimes.

## INVESTIGATION

3.      On June 25, 2025, at about 4:04 a.m., Denver (CO) Police Department officers responded to 12665 East Albrook Drive, Denver, Denver County, Colorado, on a reported armed carjacking.  The victim, F.Z.T. (a person over 21 years of age), reported he had been parked in his car, a silver Jeep Renegade displaying Colorado temporary plate 6247935, in the apartment complex parking lot while waiting for his son to come outside to the car so they could go to work.  F.Z.T. said three black males, one wearing a red

shirt and two in dark clothing between 19-28 years old, came to the driver's side window of his car, pointed a gun at him, and told him to get out of the car. F.Z.T., fearing for his life, complied and got out of the car and the suspects got into his car. F.Z.T. said the parking brake on his car was engaged so the car was moving very slowly. The suspects backed up slowly and struck another vehicle in the parking lot before shifting and driving forward. The car was moving very slowly and after about 30 feet, the suspects stopped the car, got out, and fled on foot. Denver Police officers checked the area and were unable to locate the suspects. F.Z.T. said he would recognize the suspects if he saw them again.

4.      Your affiant determined from the vehicle identification number of the victim's vehicle that the vehicle, a 2016 Jeep Renegade Trailhawk was manufactured in Melfi, Italy, and necessarily traveled in interstate commerce to reach Colorado.

5.      At about 4:42 a.m., Denver Police officers were notified of a "ShotSpotter" alert in the area of 5350 North Scranton Street, Denver, Colorado, for six shots of fully automatic gunfire. Officers responded to the area and located three males walking away from the area. All three were black males and one was wearing a red hoodie while the others were in dark clothing. Officers in uniform in marked Denver Police patrol cars attempted to contact the males and activated their emergency lights. The male suspects fled on foot from the officers. A Denver Police officer, Officer Marc-Luca Conley, #22006, reported he saw one of the suspects who was fleeing clutching at the front of his waistband as he ran, and noted the suspect's pants were weighted or sagging in that area and Conley, based on his training and experience, believed the suspect was armed.

6.      Officer Conley was able to contact and detain the suspect, who was identified as 18-year-old DHAL PIO BOL BUK. Officer Conley conducted a "pat down" and located a flathead screwdriver, a pair of gray mechanic style gloves, and a black ski mask on BUK'S person. Officer Conley did not locate a firearm but retraced the route of the suspects as they fled and located a tan Glock 19X semiautomatic handgun lying on the ground on the path of their flight. The weapon was equipped with a 31-round extended magazine which contained twenty-two (22) live 9mm cartridges, and Officer Conley noted the firearm had an additional live cartridge in the chamber of the firearm.

7.　　One of the other suspects, who was wearing a red hoodie, was observed hiding near 5505 Salem Street and was detained.  He was identified as a 13-year-old juvenile, S.G.  Officers could hear the third subject jumping fences to the west.  That suspect was not located or contacted.  S.G was placed into the rear of a marked police car.  When the officer learned S.G. was a juvenile, he did not question S.G., but heard S.G. say repeatedly "I don't know why he would do that!  I don't know why he kept shooting!"  S.G. wanted to talk to the police and the officer told him to wait until they contacted his mother.  S.G. persisted and told the officer, "The tall guy 'Dhal' was the one with the gun and tried to rob that guy at the apartments."  While retracing the suspect's path, officers located a red iPhone in the area where S.G. had been detained, and which he later claimed was his.

8.　　Officers contacted F.Z.T. and transported him to the location where BUK and S.G. had been detained.  F.Z.T identified both as being involved in the carjacking and identified BUK, who was very tall and thin, as the one with the firearm and who had gotten into the driver's seat of his Jeep.  F.Z.T. advised the gun used in the carjacking was black.

9.　　Your affiant was able to review video surveillance footage from the apartment complex of the area where the armed carjacking occurred.  In the video three subjects can be seen approaching the Jeep where F.Z.T. was seated.  Two of the subjects were dressed in black, one with a hoodie with a large white emblem on the front and the other with white shoes.  The third subject was wearing a red hoodie or jacket. The subject with the white emblem on the hoodie was noticeably taller than the other two subjects.  The footage showed the three approach the vehicle occupied by F.Z.T.  The tall subject approached the driver's side while the other two subjects approached the passenger side.  F.Z.T. can be seen fleeing the vehicle and it rolled backwards into another parked car.  The taller subject got into the driver's seat and the subject in the red hoodie got into the front passenger seat.  The third attempted to get into the rear passenger seat but was unsuccessful and fled on foot.  The Jeep pulled forward a short distance, stopped, and the tall subject and the subject in the red hoodie fled on foot, abandoning the Jeep.  When contacted Buk, who is 6'7" tall, was wearing a black hoodie with white emblem on the front, and S.G. was wearing a red hoodie.

10.    While on scene, officers observed a vehicle driving by the scene, and the occupants asked if they had S.G. in custody. Officers advised they did have S.G. in custody and how they knew S.G. was in custody. They said they saw S.G. in the back of the patrol car and had his mother on the phone, and officers asked them to ask the mother to come to the scene. S.G. identified a male subject in the passenger seat of the car as the third subject involved in the robbery, stating, "That's the older brother, it was his gun, he was with us." Officers did not contact the vehicle at that time, but tentatively identified the passenger as "Josiah Douglas" and noted his address was a short distance from where the three suspects had initially been contacted.

11.    S.G.'s mother arrived at the scene and allowed S.G. to make a statement to the police. S.G. said he was having a "sleepover" with a friend when "Dhal" and "Jeremiah" came over to the house and wanted S.G. and his friend Michael to come out and "do things" with them. They went with BUK and Jeremiah and walked down to the apartment complex where the carjacking had occurred. S.G. said they saw F.Z.T. get into his car and BUK told S.G. to "go get him" but S.G. was scared so BUK walked up to the driver's side window, took a handgun out of his pocket, tapped on the window with the handgun and told the victim to "give me your stuff." The victim got out of his car and BUK got into the driver's seat and tried to drive away, backing into another car in the lot. BUK was ultimately unsuccessful taking the vehicle, and they all fled on foot. S.G. said he and Michael met up with BUK at a nearby park and said BUK told them, "Watch this!" and racked the pistol and fired an unknown number of shots into the air. They ran and were contacted by police. S.G. described BUK's firearm as a black handgun with "19X" on the side. S.G said "Jeremiah" also had a handgun that was brown and had "19X" on the side. S.G.'s mother, E.D. (a person over 21 years of age) told police she had received a call from the mother of "Michael" and "Jeremiah" who repeatedly told E.D. she was sorry but would not tell her why and telling her to come to the scene. Police suspected the driver of the car who questioned them about having S.G. was in custody was Michael and Jeremiah's mother and the front seat passenger was "Josiah." S.G. was charged by the Denver District Attorney's Office with robbery for his participation in this offense.

4

12.     The firearm located where officers retraced the suspect's flight was submitted to the Denver Crime Lab for analysis.  It was test fired and functioned as designed, expelling a bullet from the muzzle when the trigger was pulled.  The examined noted the firearm had been modified to allow the firearm to fire automatically, like a machine gun, i.e. one trigger press discharged bullets from the firearm until the magazine was empty, or the firearm malfunctioned.  The casings from the expended cartridges that were ejected from the firearm when it was test fired were submitted for analysis and comparison in the NIBIN database.  NIBIN is a database of expended casings from automatic or semiautomatic firearms collected from crime scenes, and from test fired guns.  The casings ejected from a firearm are unique from those ejected from another firearm and can be compared.  The casings collected from the test firing of the handgun located in this matter were analyzed and were associated in NIBIN with casings collected from a number of crime scenes between May and July of 2023.  The crime scenes spanned a number of metropolitan Denver cities and a number of different crimes; Denver (illegal discharge, firing into an occupied building, and aggravated assault); Arvada (attempted homicide); Wheat Ridge (attempted homicide); and Westminster (1st degree homicide).

13.     Both Buk and S.G. had been swabbed for gunshot residue at the time of their arrests.  An analysis of the samples by the Denver Crime Lab "revealed the presence of a characteristic particle of gunshot primer residue" from both subject's samples indicating they had either fired a gun, were in the immediate vicinity when a firearm was discharged, handled a firearm, or touched a surface which had GSR on it.

14.      On July 2, 2025, your Affiant and members of the FBI Denver Evidence Response Team searched the area near 5350 North Scranton Street (Elmendorf Park) where the ShotSpotter alert had been received on June 25, 2025, and where it was believed Buk had fired a handgun according to S.G.  No expended casings had been found on June 25, 2025, and your affiant noted the grass in the park would likely conceal any casings which had been ejected in the grass.  Using metal detectors, six expended 9mm casings were located in the area where ShotSpotter indicated the firearm had been discharged.  Later NIBIN

testing confirmed the casings (six in total) had been fired from the same handgun recovered on June 25, 2025.

## CONCLUSION

Based on the foregoing, your affiant believes that probable cause exists that on or about June 25, 2025, in the State and District of Colorado, DHAL PIO BOL BUK did commit the crimes of Carjacking, in violation of Title 18, United States Code, Section 2119(1); Brandishing a Firearm during and in Relation to a Crime of Violence in violation of Title 18, United States Code, Section 924(c)(1)(A)(ii); Unlawful Possession of a Machine Gun in violation of Title 18, United States Code, Section 922(o)(1). The foregoing is true and correct to the best of my knowledge, information, and belief.

*s/Christopher Pyler*
Task Force Officer, FBI Safe Streets TF

Sworn to before me this __31st__ day of __July__, 2025.

Hon. Susan Prose
United States Magistrate Judge

**Affidavit reviewed and submitted by Brian Dunn, Assistant United States Attorney.**